Edward F. HUNSSINGER, as Trustee of the Midland Brokerage Co., Inc. Employee's Profit Sharing Plan and Trust, Plaintiff-Appellant,

v.

ROCKFORD BUSINESS CREDITS, INC., William E. Fitzgerald and Thomas M. Kazmierczak, Defendants-Appellees.

No. 83–2169.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 6, 1984.

Decided Oct. 4, 1984.

tection of the federal securities acts merely because it bears a fixed rate of interest.

## I. FACTS

The complaint in this action alleged the following facts. Sometime prior to August 17, 1981, Rockford Business Credits, Inc., (RBC), a commercial factor incorporated in Illinois, sought to raise capital for its general business enterprise. RBC and its certified public accountant, Thomas Kazmierczak, successfully solicited funds from at least thirty-nine members of the general public and raised at least $2,000,000. Each of those successfully solicited received an instrument designated a "note" in exchange for his funds. None of the thirty-nine purchasers of the notes received any rights to participate in or otherwise affect the day-to-day management of RBC. The complaint also stated that none of the note purchasers was in the trade or business of making commercial loans.

Sherwin D. Abrams, Abrams, Rifkin & Chapman, Chicago, Ill., for plaintiff-appellant.

Rosalind C. Cohen, Sec. & Exchange Comm., Washington, D.C., for plaintiff-intervenor.

Robert M. Kluchin, Karon, Morrison & Savikas, Chicago, Ill., for defendants-appellees.

Before PELL and ESCHBACH, Circuit Judges, and BARTELS, Senior District Judge.*

PELL, Circuit Judge.

This case comes to us on appeal from the final judgment entered in the district court dismissing plaintiff's action for lack of subject matter jurisdiction. The complaint alleged numerous violations of the federal securities law in connection with the purchase of notes by a profit sharing trust. The district court determined that the notes were not "securities" within the meaning of the federal securities acts. The case requires us to determine whether a note, issued pursuant to a solicitation of the general public, must be excluded from the pro-

The plaintiff in this case, Edward F. Hunssinger, is the trustee of an employee profit sharing trust established by Midland Brokerage Company, a corporation organized under the laws of Delaware. In August 1981, Kazmierczak, who was also Hunssinger's accountant, and William Fitzgerald, the president of RBC, solicited Hunssinger to purchase RBC's notes on behalf of the profit sharing trust. On the basis of Kazmierczak's and Fitzgerald's representations, some of which were false, Hunssinger purchased on August 17, 1981, one note on behalf of the trust in the principal amount of $30,000. A copy of the note was attached to the complaint and showed that the note bore interest at the rate of one percent above the prime rate as established on the first Monday of each month by the Continental Illinois National Bank & Trust Company of Illinois. The note also gave as the maturity date "8–17–82 or before." The note apparently was composed by filling blanks on a standardized promissory note form.

* Senior District Judge John R. Bartels, Eastern District of New York, is sitting by designation.

In 1982, prior to the stated date of maturity, Hunssinger tendered the note for redemption, but the tender was refused. Hunssinger brought this suit shortly thereafter.

Hunssinger attached to the complaint several letters and documents he received from Fitzgerald. The first letter, dated August 17, 1981, thanked Hunssinger for his "investment in Rockford Business Credits, Inc." The letter also stated that the "investment" would earn interest quarterly, and it concluded by stating, "We look forward to a long relationship and hope to serve you in any way possible." On September 30, 1981, and again on December 30, 1981, Hunssinger received "Statements of Account" from RBC. The statements showed the interest that the notes had accrued since the "investment date" of August 17, 1981. Finally, in a letter dated June 24, 1982, a date after Hunssinger tendered the note, Fitzgerald explained that forces beyond his control had forced RBC into decline. Fitzgerald admitted that some properties RBC had purchased were titled in his individual name. He also acknowledged that he might be criminally liable for some of his activity.

Hunssinger's complaint was in ten counts. Count I alleged the sale of unregistered securities in violation of Section 5 of the Securities Act of 1933. Count II alleged fraud in connection with the purchase of a security in violation of Section 12 of the Securities Act of 1933. Count III, brought under Section 10(b) of the Securities Exchange Act of 1934, also alleged fraud in connection with the purchase of a security. Count IV alleged the sale of notes not pursuant to an indenture as required by the Trust Indenture Act of 1939. Counts V through X were pendent state fraud and securities fraud claims brought under the laws of Illinois.

On May 25, 1983, Judge Grady granted defendant's motion to dismiss Counts I through IV on the ground that the $30,000 note did not constitute a "security" within the meaning of the federal securities laws. Judge Grady stated, "[P]laintiff was to re-ceive a set rate of interest which did not depend on the success or failure of RBC's business enterprise. Due to this fact and the short maturity of the note (one year), we hold that the economic realities of the transaction indicate that this note represents a commercial loan, not an investment." Judge Grady then exercised his discretion not to hear the remaining state law claims. This appeal is taken from the judgment of the district court dismissing the suit.

## II. DISCUSSION

Hunssinger has based his federal causes of action upon three federal statutes, the Securities Act of 1933, the Securities Exchange Act of 1934, and the Trust Indenture Act of 1939. Section 2 of the Securities Act of 1933 defines "security" as "any note, stock, treasury certificate, bond, debenture, ... [or] investment contract." This definition is prefaced by the phrase "unless the context otherwise requires." 15 U.S.C. § 77b. The Securities Exchange Act of 1934 defines a security using nearly identical terms, and the minor variations between the definitions in the two acts are not significant for purposes of this appeal. Section 303 of the Trust Indenture Act of 1939 provides that "[A]ny term defined in section 2 of the Securities Act of 1933 and not otherwise defined in this section shall have the meaning assigned to such term in such section 2." 15 U.S.C. § 77ccc. Section 303 does not "otherwise define" a note.

Although Section 2 of the Securities Act of 1933 by its terms encompasses "any note," this as well as other Circuits have relied upon the prefatory phrase "unless the context otherwise requires" to exclude certain notes from the protection of the federal securities acts. The problem of determining which notes merit the protection afforded by the securities acts is a vexing one, and it has caused some disharmony among the Circuits. The Second Circuit employs a "literal approach." *See Exchange National Bank v. Touche Ross & Co.*, 544 F.2d 1126, 1138 (2d Cir.1976). The

Ninth Circuit uses the "risk capital approach." *See Great Western Bank & Trust Co. v. Kotz*, 532 F.2d 1252 (9th Cir. 1976). This Circuit as well as the Fifth Circuit use the "commercial/investment" test.

■ The commercial/investment test seeks to confine the protection of the securities laws to investors and exclude from the acts' protection borrowers and lenders in commercial settings. Thus, in *Lincoln National Bank v. Herber*, 604 F.2d 1038 (7th Cir.1979), we affirmed the district court's dismissal of a complaint which merely alleged that the plaintiff bank loaned the defendant individual a substantial sum in exchange for promissory notes secured by stock which later turned out to be worthless. The district court properly concluded that the antifraud provisions of the securities acts were not intended to cover "run of the mill commercial notes." *Lincoln National Bank v. Lampe*, 414 F.Supp. 1270 (N.D.Ill.1976). In *C.N.S. Enterprises v. G. & G. Enterprises*, 508 F.2d 1354 (7th Cir.1975), *cert. denied*, 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40, the plaintiff purchased a business and executed two notes to the defendant bank that financed the transaction. The plaintiff, alleging that the value of the business had been misrepresented, brought suit under the federal securities laws claiming that the notes were securities. We rejected the argument, finding nothing in the complaint that would show that the bank had purchased the notes as "investments." The notes merely evidenced an ordinary commercial loan taken to make partial payment upon the purchase of a business's assets. We indicated that confining the protection of the securities laws to investors was consistent with Congress's legislative intent, lest every individual who executes a note when taking out a car loan from a bank have recourse to the federal securities acts under the theory that he sold the bank a "security." *See also Lino v. City Investing Co.*, 487 F.2d 689, 695 (3d Cir.1973) (without the commercial/investment rule, "any consumer who bought an article 'on time' and issued a note would be able to

sue in federal court on the theory that the retailer had purchased his 'security' ").

■ Although notes issued in exchange for bank loans and those issued in purchase transactions are plainly not "investments," notes issued in other transactions often fall in a gray area where characterization is difficult. In *C.N.S. Enterprises, supra*, we stated that the determination whether a note transaction was tainted with the characteristics of a commercial loan was not one which could be made by a mechanical test. *C.N.S. Enterprises, supra*, at 1362. Rather, the characterization must be made on a case-by-case basis. *Id.* We have since enumerated some of the factors useful in determining whether the purchaser of a note is an investor or merely a lender in a commercial transaction. *See Emisco Industries, Inc. v. Pro's, Inc.*, 543 F.2d 38 (7th Cir.1976); *American Fletcher Mortgage Co. v. United States Steel Credit Corp.*, 635 F.2d 1247 (7th Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981).

The district court looked primarily at one factor to determine whether the note in the instant case was an investment or evidence of a commercial loan. The court stated, "[P]laintiff was to receive a set interest rate which did not depend on the success or failure of RBC's business enterprise." The fixed rate of interest was critical, and the court accordingly dismissed the complaint for want of subject matter jurisdiction. We do observe, as a technical matter, that the note Hunssinger purchased bore interest at a rate that was not fixed. Rather, the note bore a "floating rate" of interest, a rate that varied from month to month according to the prime rate. The district court used the term "fixed rate of interest" because the return on the note varied according to factors not within the control of RBC. For purposes of this appeal, we shall adopt the district court's phrase.

The court relied upon our decision in *American Fletcher, supra*, to buttress its conclusion that a fixed rate of interest was a factor indicating that the note was issued

in the context of a commercial loan. The court's reliance on *American Fletcher*, however, was misplaced. In *American Fletcher*, it was uncontested that the promissory note involved was not a security. At issue was whether a *loan participation agreement* could be considered a security. We analogized the loan participation agreement to an investment contract, and we concluded that three of the four elements essential to an investment contract were not present. In particular, the counterclaimant, United States Steel Credit Corporation, did not have a "reasonable expectation of 'profits'" because the return to United States Steel Credit Corporation would not increase if the underlying project were successful.

■■■ The fact that a note bears a fixed rate of interest ordinarily will be of little significance in determining whether a note is purchased as an investment or received in return for a commercial loan. This court has long held that ordinary commercial paper, which bears a fixed rate of interest, can be a security within the meaning of the federal securities acts. *See Sanders v. John Nuveen & Co.*, 463 F.2d 1075 (7th Cir.1972), *cert. denied*, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302. A fixed rate of interest is simply a characteristic of the general category "notes." A note that bears a fixed rate of interest is just as likely to be an investment as it is likely to be evidence of a commercial loan. In order for a factor to be useful in the process of characterization, it cannot be neutral among alternatives, and hence the district court erred when it relied upon a fixed rate of interest to exclude the note in this case from the coverage of the securities laws. *See generally* Sonnenschein, Federal Securities Law Coverage of Note Transactions: The Antifraud Provisions, 55 Bus.Law 1567, 1591 (1980).

In spite of *Sanders v. John Nuveen & Co.*, RBC urges us to find that the presence of a fixed rate of interest is in fact dispositive against finding an investment. RBC bases its argument upon the four-part "investment contract test," as articulated

by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). The Securities and Exchange Commission filed a brief amicus curiae in this case to voice strenuous objection to RBC's position. We repeat below RBC's argument and explain our position with respect to each point of the argument.

RBC makes two critical points in its argument. First, it contends that all instruments must independently pass the "investment contract test" in order to be considered securities within the meaning of the federal securities acts. In *Howey*, the Court held that an interest in a unit of a citrus grove coupled with a contract for cultivation of the grove unit was an "investment contract" within the meaning of Section 2 of the Securities Act of 1933. An investment contract, the Court stated, is a contract, transaction, or scheme whereby a person (1) "invests his money" (2) "in a common enterprise" (3) "and is led to expect profits" (4) "solely from the efforts of the promoter or a third party." *Id.* at 298–99, 66 S.Ct. at 1102–03. In support of its position that every instrument that purports to be a security must meet the four criteria set out in *Howey*, RBC cites *United Housing Foundation v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). In *Forman*, the Court considered whether shares in a housing cooperative were securities. The Court repeated the "investment contract test" we quoted above and then stated: "This test, in shorthand form, embodies all the essential attributes *that run through all the Court's decisions defining a security.*" *Id.* at 852, 95 S.Ct. at 2060 (emphasis added). RBC uses this broad statement by the Court as support for its contention that the investment contract test is the basic test for all securities. It argues that instruments that do not satisfy all four elements of the investment contract test do not constitute securities and are not afforded the protection of the federal securities acts.

The second point critical to RBC's argument is that the term "profits" for pur-

poses of the third element in the investment contract test excludes fixed interest payments. This position comports with this court's opinion in *American Fletcher, supra*. In *American Fletcher,* we considered whether a loan participation agreement met the investment contract test. With respect to the third requirement of the four-part test, we concluded that the participation did not lead to an expectation of "profits" because it entitled the complaining party to a fixed return independent of the profitability of the underlying project. 635 F.2d at 1254. The Supreme Court has strongly indicated that this interpretation of the term "profits," as used in the investment contract test, is correct. Thus, in *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), the Court held that a withdrawable capital share in an Illinois savings and loan association was a security. The Court reasoned that the shares "most clearly resemble investment contracts," *id.* at 338, 88 S.Ct. at 554, and that the test articulated in *Howey* was met. The Court stated:

Petitioners are participants in a common enterprise—a money-lending operation dependent for its success upon the skill and efforts of the management of City Savings [the Illinois savings and loan association] in making sound loans. Because Illinois law ties the payment of dividends on withdrawable capital shares to an apportionment of profits, the petitioners can expect a return on their investment only if City Savings shows a profit. If City Savings fails to show a profit due to the lack of skill or honesty of its managers, the petitioners will receive no dividends. Similarly, the amount of dividends the petitioners can expect is tied directly to the amount of profits City Savings makes from year to year. Clearly, then, the petitioner's withdrawable capital shares have the essential attributes of investment contracts as that term is used in § 3(a)(10) and as it is defined in *Howey*.

*Id.* at 338–39, 88 S.Ct. at 554. Although the opinion does not state so in as many words, the implication that follows from *Tcherepnin* is that a note holder, who is entitled to payment of interest whether or not the obligor has current earnings and whose interest payment will not increase if the obligor has a successful year, does not, for purposes of the investment contract test, have a reasonable expectation of "profits." In *Forman*, the Court once again addressed the definition of "profits":

By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, as in [*SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943)] (sale of oil leases conditioned on promoters' agreement to drill exploratory well), or participation in earnings resulting from the use of investor's funds, as in *Tcherepnin v. Knight, supra* (dividends on the investment based on savings and loan association's profits).

421 U.S. at 852, 95 S.Ct. at 2060. The Court thus defined an expectation of profits in terms of a residual claim on an entity's assets and earnings. The context in which this passage appears suggests that the two enumerated categories of profits are exclusive. Finally, in *Marine Bank v. Weaver*, 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), the Court held that a certificate of deposit issued by a domestic bank was not a security. The Court distinguished the certificate of deposit from the withdrawable capital shares found to be securities in *Tcherepnin* by stating, "The withdrawable capital shares found there [in *Tcherepnin*] to be securities did not pay a fixed rate of interest; instead, purchasers received dividends based on the association's profits." *Id.* at 557, 102 S.Ct. at 1224. Since the Court found the withdrawable capital shares in *Tcherepnin* to resemble most clearly investment contracts, the implication that follows from the Court's language in *Marine Bank* is that the term "profits" as used in the investment contract test does not include fixed interest payments.

It is plain that both points of RBC's argument cannot at once be correct. If all instruments independently had to meet the

investment contract test articulated in *Howey* and if the term "profits" as used in that test were not to encompass fixed interest payments, then a twenty-year corporate bond issued in a public offering would not be a security. It is manifestly evident that RBC's test sweeps too broadly. If we were to accept RBC's argument, then we would have to remove the protection of the federal securities laws from most debt offerings. That result would clearly contradict Congress's intention to protect investors, and it would make superfluous several terms—such as "bond" and "note"—in the definitional sections of the securities acts. We accordingly must reject at least one of the two points critical to RBC's argument.

■ Of the two points RBC maintains are correct, the weakest one appears to be the point that every instrument must independently pass the investment contract test in order to be a security. RBC's principal support for this point is a single statement in *Forman* to the effect that the investment contract test "embodies the essential attributes that run through all the Court's decisions defining a security." In this statement, however, the Court merely identified a characteristic of its past decisions, all of which involved an unusual instrument not easily placed within the ambit of the other terms enumerated in the definitional sections of the securities acts. At the time of the *Forman* decision, the Court had not yet considered a debt instrument. *See Exchange National Bank, supra,* at 1136. An additional reason militates against finding that the investment contract criteria apply to all securities. In *Forman* itself the Court initially considered whether respondents' shares could be "stock" as the term is used in Section 2(1) of the Securities Act of 1933. In this section of the opinion, the Court did not apply the investment contract test. Only after the Court rejected respondents' characterization of their shares as "stock" did the Court look to the investment contract test. The implication that follows from the organization of the Court's opinion is that the test articulated in *Howey* only determines whether an instrument is an "invest-

ment contract," a separate statutory term in the definitional section of the securities acts; an instrument that does not pass the investment contract test may still be a security if it falls under one of the other specific statutory terms.

■ RBC's second point—that the term "profits" excludes fixed interest payments—appears to us to be more firmly anchored in the Supreme Court's securities cases than does RBC's first point. As a matter of original principles, however, one may question the wisdom of excluding fixed interest payments from the definition of "profits." Congress listed a large number of terms, including the seemingly broad term "investment contract," in the definitional sections of the securities acts apparently in order to prevent imaginative promoters from avoiding regulation by inventing nonconventional instruments. *See Sutter v. Groen,* 687 F.2d 197 (7th Cir.1982). It is arguable that giving a restrictive definition to the term "profits" would be in frustration of Congress's intention. It is of course true that the Supreme Court has strongly indicated that the term "profits" should exclude fixed interest payments, and decisions of this court contain language following the path set by the Court. *See American Fletcher, supra,* at 1254; *Canadian Imperial Bank of Commerce v. Fingland,* 615 F.2d 465, 470 (7th Cir.1980). In a suitable case we may reconsider our interpretation of the Supreme Court cases we have cited, but on the present occasion we have no reason to embark on such a reconsideration.

To summarize, the district court erred when it relied upon the presence of a fixed rate of interest as determinative that the notes in this case were evidence of a commercial loan. A fixed rate of interest is simply a characteristic of the general category "notes," of which investments and commercial loans are two sub-categories. Furthermore, we reject RBC's argument that the notes at issue must be evidence of commercial loans because they fail independently to pass the investment contract test.

The investment contract test determines whether a particular instrument is an "investment contract," a distinct term in the definitional sections of the securities acts. An instrument that fails to satisfy all four requirements of the investment contract test may still fall under one of the other statutory terms in the definitional sections and hence be subject to the substantive provisions of the acts. At least two other circuits have also rejected the argument that all instruments must pass the investment contract test in order to be "securities." *See Daily v. Morgan,* 701 F.2d 496 (5th Cir.1983); *Exchange National Bank v. Touche Ross & Co., supra,* at 1136.

▮▮▮ We now turn to the second factor to which the district court referred, albeit a tangential reference, when it determined that the note RBC issued was not a security. The court relied at least in part upon the fact that the note had only a one-year term to maturity when it found that the note represented a commercial loan. We again find that the district court relied upon a factor not useful in the process of characterization. Banks regularly make loans to individuals or business entities and take back a note that has a short term to maturity. *See Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930–32 (2d Cir. 1984), for a description of a series of commercial bank loans each evidenced by a promissory note with a short term to maturity. Conversely, business entities often float short-term investment notes to finance their operations. *See Sanders v. John Nuveen & Co., supra,* at 1076, for a description of short-term notes issued to the public to finance current transactions. The fact that a particular note bears a short term to maturity points neither in the direction of a commercial loan nor in the direction of an investment transaction. The presence of a short term to maturity can be no more helpful in the process of characterization than can be the presence of a fixed rate of interest.[1]

▮▮▮ Having rejected the presence of a fixed rate of interest and a short term to maturity as helpful in determining whether a note is a security, we turn to some of the factors that do aid in the process of characterization. The district court tried to perform the process of characterization by looking solely at the face of the note. We believe the district court thereby missed many important facts related to the plan of distribution and terms of the transaction that point in the direction of an investment note. RBC accomplished the sale of notes by a broad solicitation of members of the general public, none of whom sought a managerial interest in RBC. *See C.N.S. Enterprises, supra,* at 1361; *Lino, supra,* at 694. RBC sold its notes to at least thirty-nine purchasers and thereby raised approximately $2,000,000. RBC broke the $2,000,000 transaction down into small units suitable for purchase by members of the general public seeking a passive source of income. The solicitation of members of the general public seeking a passive return from their capital and the sale to them of units of a larger offering are the hallmarks of an investment transaction.

▮▮▮ We also note that the complaint in the case at bar did not allege any of the facts that generally attend an ordinary commercial loan transaction. If a person gives his note when purchasing consumer goods, he has not participated in a securities transaction. *See Lino, supra,* at 695. Similarly, if a bank or other commercial lender makes a loan to finance business

---

**1.** Both the Securities Act of 1933 and the Securities Exchange Act of 1934 exempt notes with maturities under nine months from some substantive provisions relevant to this action. *See* 15 U.S.C. §§ 77c(a)(3), 77q(c), 78c(a)(10). These exemptions need not concern us in this case because the note that Hunssinger bought had a maturity of one year. The fact that it could be retired before one year might make it a demand note, but even a demand note is gener-

ally not considered to fall under the short-term note exemptions. *See Zeller v. Bogue Elec. Mfg. Corp.,* 476 F.2d 795, 799 (2d Cir.1973), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973). In any event, the exemptions could not be applicable to the note in the case at bar because the note is not "prime quality commercial paper," a requisite to the application of the exemptions. *See Sanders v. John Nuveen & Co., supra.*

transactions and takes a note in return, the parties could not be said to have participated in a securities transaction. *See Chemical Bank, supra,* at 939; *Lincoln National Bank v. Lampe, supra,* at 1275; *Great Western Bank, supra.* Finally, if the seller of a business's assets or stock takes a note from his buyer, a commercial loan transaction would also be evident. *See Emisco, supra; C.N.S. Enterprises, supra.* The transaction in the case at bar fits none of these paradigms of a commercial loan. RBC was plainly not a party to a consumer transaction. Similarly, none of the note obligees was in the trade or business of making commercial loans. Finally, none of the obligees sold RBC a business's assets or stock. The absence of facts we ordinarily associate with a commercial loan transaction aids us in characterizing the notes in the case at bar as investments.

We in addition note that RBC, in a series of communications to Hunssinger, referred to the note as an "investment." Thus, in two letters from RBC to Hunssinger and in two "Statements of Account," RBC itself characterized the note as an "investment" or referred to the note's purchase date as an "investment date." In *Forman, supra,* 421 U.S. at 850, 95 S.Ct. at 2059, the Supreme Court stated that the name an issuer gives an instrument should not be dispositive on the issue of coverage by the securities acts. Yet the Court made plain that the name is not wholly irrelevant to the process of characterization. We believe that in this case, RBC's repeated reference to the note as an investment could justifiably lead Hunssinger to assume that the federal securities laws applied. *See id.* Although Hunssinger's potential reliance upon Fitzgerald's characterization does not dispose of the issue, we do accord some weight to the label Fitzgerald gave to the instrument under discussion.

In sum, the facts attending the transaction in which RBC issued a note to Hunssinger lead us to conclude that the instrument in controversy is a security within the meaning of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Trust Indenture Act of 1939. Although we, in contrast to the district court, place emphasis upon the transaction in which the note was issued in order to reach our conclusion, we do not suggest that the terms of the note instrument or its accompanying documents are unhelpful in the process of characterization. For example, if the terms of a note instrument gave an obligee extensive rights to affect the management of the obligor, we would find absent the passivity we have already identified as a characteristic of an investor. We take issue with the district court in this case only because it *confined* its analysis to the four corners of the note. It looked exclusively at the rate of interest due the obligee and at the note's term to maturity. The district court erred when it used these terms of the note in the process of characterization and it furthermore erred by ignoring the facts attending the transaction when it decided the note was not a security.

For the foregoing reasons, we REVERSE the district court's dismissal of the case for want of federal subject matter jurisdiction and we REMAND the cause to the district court for further proceedings consistent with this opinion.